IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| KIM J. GILMORE, | ) | C.A. No. 3:06-3594-CMC |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **OPINION AND ORDER** |
| | ) | **GRANTING MOTION FOR** |
| R. JAMES NICHOLSON, SECRETARY | ) | **SUMMARY JUDGMENT** |
| DEP'T OF VETERANS AFFAIRS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

Through this action, Plaintiff, Kim J. Gilmore ("Gilmore"), seeks recovery for alleged race-based discrimination. Specifically, Gilmore, who is African-American, alleges that Defendant, R. James Nicholson, Secretary, Department of Veterans Affairs ("Secretary"), discriminated against her by offering her a lower salary than was offered to a less qualified Caucasian nurse, Shelby Rials, who was hired for the same position.

The matter is now before the court on Defendant's motion for summary judgment. For the reasons set forth below, the motion is granted.[1]

## STANDARD

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). It is well established that summary judgment should be granted "only when it is clear that there is no dispute concerning either

---

[1] This matter was initially assigned to a magistrate judge for pretrial proceedings pursuant to Local Civil Rule 73.02(B)(2)(g). The matter became unassigned as a result of the vacancy of one magistrate judge position and division transfer of the previously assigned magistrate judge. To avoid a resulting backlog in cases, the undersigned has elected to withdraw the reference in this matter and resolve the motion without a report and recommendation.

the facts of the controversy or the inferences to be drawn from those facts." *Pulliam Inv. Co. v. Cameo Properties*, 810 F.2d 1282, 1286 (4th Cir. 1987).

The party moving for summary judgment has the burden of showing the absence of a genuine issue of material fact, and the court must view the evidence before it and the inferences to be drawn therefrom in the light most favorable to the nonmoving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). When the nonmoving party has the ultimate burden of proof on an issue, the moving party must identify the parts of the record that demonstrate the nonmoving party lacks sufficient evidence. The nonmoving party must then go beyond the pleadings and designate "specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

A party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). Therefore, "[m]ere unsupported speculation . . . is not enough to defeat a summary judgment motion." *Ennis v. National Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995).

## FACTS

Taken in the light most favorable to Gilmore, the non-moving party, the facts are as follows. In late 2003, Gilmore, Rials, and others applied for a nurse practitioner position with the William Jennings Bryan Dorn Medical Center ("Dorn"). Dorn is a hospital within the Department of Veterans Affairs ("VA") and, therefore, within the Secretary's area of responsibility.

Gilmore was found to be the most qualified candidate and was offered the position by the selecting officials: Earl Burch, Director of the Mental Health Care Service Line ("Mr. Burch"); and Diana Thorne, M.D. ("Dr. Thorne"). Mr. Burch and Dr. Thorne advised Human Resources of their

selection. Human Resources then gathered information from Gilmore's prior employers and provided this and related information (*e.g.*, Gilmore's resume and/or application) to the Nurse Professional Standards Board ("Nursing Board"). The Nursing Board is the entity responsible for setting nurses' salaries.

The Nursing Board consisted of three nurses, two of whom were not aware of Gilmore's race. Based on the information provided to it, the Nursing Board determined that Gilmore had three years and ten months of creditable service as a nurse practitioner and was, therefore, qualified to be hired as a Nurse Practitioner Grade III, Step 1. This grade and step translated to an annual salary of $57,765. Only employment as a nurse practitioner was considered creditable service for purposes of the salary determination.

Unfortunately, the offered salary was $10,000 less than the salary Gilmore was receiving as a contract nurse.[2] Gilmore informed Dr. Thorne and Mr. Burch that she could not accept such a pay cut. Dr. Thorne and Mr. Burch, who were eager to hire Gilmore, prevailed upon their superior to allow them to offer Gilmore a recruiting bonus of $7,000 to make up part of the first year reduction. Gilmore did not find the added bonus (and any other benefits which might have come with the VA position) sufficient to make up for the salary difference and, therefore, declined the offer.

The position was re-advertised with some modifications in February 2004. Gilmore was one of six applicants. Gilmore was asked by a Dorn representative why she was reapplying since she had previously rejected an offer of the same position. Gilmore responded that she hoped her several months of additional experience since the prior application would modify the amount offered.

---

[2] Although Gilmore's actual employer was a third party, she was performing work under contract at one or more VA facilities.

3

Testimony of Gilmore, Dkt. No. 32-3 at 10.[3] Dorn declined to select any applicant from this announcement and so advised Gilmore.

The position was again advertised in May 2004. Rials applied for and was selected for the re-advertised position.[4] The same salary setting process was initiated for Rials as had been followed for Gilmore: Human Resources was informed of the selection and was tasked with gathering information confirming Rials' prior employment (dates and positions) and forwarding the same to the Nursing Board which would use the information to set Rials' salary.

Rials, however, intervened when she felt that the process was moving too slowly. She undertook to gather employment verifications from her prior employers. In the process, Rials discovered several mistakes and was able to get her prior employers to correct the errors. No evidence has been proffered to suggest that Rials was encouraged by anyone to intervene in the process in this manner. Neither has the court been presented with any evidence that Gilmore sought and was denied a similar opportunity.

The Nursing Board considered the information gathered by Human Resources and Rials and, based on that information, calculated that Rials had five years and three months of creditable service. This length of service allowed Rials to be classified as a Nurse Practitioner Grade III, Step 4 which translated into a salary offer of $64,677.

---

[3] Testimony cited in this order is from the administrative hearing. A transcript of this hearing was filed as Dkt. No. 32-3 and 32-4.

[4] There is apparently some dispute as to whether Gilmore should have been considered for this position based on her February application. Gilmore maintains that she was advised that her application would be considered. Defendant, however, maintains that Gilmore should have reapplied if she wanted to be considered. That dispute is not, however, relevant to the issues now before the court which focus not on Gilmore's non-selection for the re-advertised position but on the salary which she was offered when she first applied and was selected.

There was apparently some error in the calculation of Rials' years and months of creditable service either by Human Resources or by the Nursing Board. In either event, several Nursing Board witnesses were asked during the administrative hearing to explain how they were able to come up with five years and three months of creditable service for Rials. These witnesses conceded that, looking at the material available during the hearing, they could only come up with four years and seven or eight months of service. *E.g.* Testimony of Nancy Smith, Dkt. No. 32-3 at 69; Testimony of Susan Finley, Dkt. No. 32-3 at 84. These witnesses were not able to explain the source of the Nursing Board's error which gave Rials credit for seven to eight months more than she was due. There is, however, no evidence to suggest that the error was intentional, much less that it was the result of race-based animus.[5]

At some point after Rials began her new position, Gilmore, through conversation with Rials, learned that Rials had been awarded a higher starting salary than was offered to Rials.[6] Testimony of Gilmore, Dkt. No. 32-3 at 35. Gilmore, thereafter, challenged the difference in salaries though appropriate administrative proceedings followed by the present action. In the course of the administrative investigation, Gilmore learned of an apparent error in the information considered by the Nursing Board regarding her own creditable service. In Gilmore's view, this error caused her to be given credit for five fewer months of creditable service than she should have been given. *Id.*

---

[5] As to the latter point, it is notable that two of the three members of Rials' Nursing Board were not aware of her race, just as two of the three members of Gilmore's Nursing Board were not aware of her race.

[6] Combined with her first year bonus, Gilmore's first year salary would have been slightly higher than Rials' first year salary. However, this would not necessarily erase the potential long-term impact of the difference in starting salary. That would depend on the relative degree to which the two individual's salaries would have increased in later years, a matter as to which the record is silent.

5

at 16, 22-25 & 34.[7]

While Gilmore concedes that the Nursing Board accurately calculated her years of service and resulting salary *based on the information given to them*, she contends that the Secretary is responsible for the error in the information considered because the VA failed to obtain correct information from her former employers. Gilmore Dep. at 26. Gilmore contends that the VA was on notice of the errors because the information obtained differed from what was on her resume and application. *Id.* at 26 & 37-38. Gilmore's resume and/or application, however, only listed calendar years in which she held various prior positions. The months reported to Human Resources by Gilmore's former employers fall within these date ranges.

## ARGUMENTS

**Secretary's Arguments.** In his motion for summary judgment, the Secretary sets out, in detail, the facts underlying Gilmore's claims. These facts are taken primarily from the transcript of proceedings before the administrative law judge who considered Gilmore's administrative claim. Gilmore has not directed the court to any relevant errors in or significant omissions from the Secretary's statement of uncontroverted facts.[8]

**Race Discrimination Claim**. After setting forth the factual background, the Secretary notes that Gilmore has not adduced any direct evidence of discriminatory intent. The Secretary, therefore, assumes that Gilmore is proceeding under the burden shifting scheme set forth in *McDonnell*

---

[7] Neither party has provided the court with information as to whether the added five months would have modified Gilmore's pay grade.

[8] As explained above, Gilmore does take issue with Defendant's claim that she did not apply for the position when it was advertised for the third time. This dispute is not, however, relevant to the claims in this action. *See supra* n. 4.

6

*Douglas Corp. v. Green*, 411 U.S. 792 (1973).  Acknowledging that the usual variations on this framework may not fit Gilmore's claim precisely, given that she was offered the position, the Secretary argues that the third element of the *prima facie* case in this action might fairly be expressed as requiring Gilmore to show that "she was selected but not offered the salary she wanted."  Dkt. No. 32-3 at 15.  He acknowledges, nonetheless,  that Gilmore "may allege that she was treated differently from a similarly situated white employee" given that Rials was offered a higher starting salary than was offered Gilmore.  As to this characterization of the case, the Secretary argues that Gilmore has failed to produce evidence that she and Rials were similarly situated in light of the differences in creditable service as presented to the Nursing Board.

As to Gilmore's claim that the VA should have looked into claimed "discrepancies" between her application or resume and information reported by her former employer, the Secretary argues that Gilmore's resume and/or application were too vague to give rise to any such duty.  He also notes that the alleged differences in treatment were purely the result of differences in the applicant's approach: Rials having taken it on herself to insure that accurate information was provided by her former employers while Gilmore undertook no similar action and provided only vague date ranges as to her prior positions.

Based on the above arguments, the Secretary asserts that Gilmore can neither make out a prima facie case nor overcome the Secretary's proffered legitimate reason for offering Gilmore less than Rials.  Both arguments center on the Nursing Board's reliance on information provided regarding Rials' and Gilbert's prior employment.

**Due Process Claim.**  As to Gilmore's claim that she was denied due process in the administrative proceeding, the Secretary relies on sovereign immunity as a complete defense.

Specifically, the Secretary notes that the United States has not waived its immunity with respect to due process claims. Dkt. No. 32-2 at 17 (citing *Loeffler v. Frank*, 486 U.S. 549, 554 (1988); *Radin v. United States*, 699 F.2d 681, 684-85 (4th Cir. 1983)).

**Gilbert's Response.** In her response, Gilbert does not address her claims under either the direct evidence or *McDonnell Douglas* proof schemes. She does, however, argue that summary judgment should be denied as to her race discrimination claim because: (1) she was more qualified than Rials; (2) Rials was allowed to request a particular salary of the selecting official whereas Gilbert was only given a specific offer (salary plus bonus); (3) Rials was allowed to intervene in the process of gathering (and correcting) her prior-employment information whereas Gilbert was not offered this opportunity; and (4) "Dorn VA hospital has a history of discriminating against African-American nurses." Dkt. No. 39 at 1. In support of the last claim, Gilbert offers affidavits from other Dorn employees who claim that they have either observed or have been the subject of racial discrimination.[9]

Gilmore mentions her due process claim only briefly, and only in her "Statement of the Case" in which she incorrectly describes this claim as follows: "Plaintiff also alleges a due process violation *in the handling of her administrative claim*, Plaintiff was denied the opportunity to add a cause of action for disparate treatment of all African-American nurses at the Dorn VA hospital." Dkt. No. 39 at 2 (emphasis added). In her complaint, by contrast, Gilbert relies on alleged error in the VA's *determination of her qualifications* which allegedly led the VA to offer her a lower salary than that to which she was entitled. Dkt. No. 1 at 3. This error necessarily occurred prior to the

---

[9] As explained below, one of the three affidavits is so illegible that the court cannot discern any portion of its content beyond the affiant's and notary's signatures. Of the remaining two, one appears to be directed primarily toward the claim that Gilbert was more qualified than Rials, a matter which is not in dispute. However, this affidavit also includes allegations of racial discrimination and is, therefore, considered for this additional purpose.

8

administrative proceedings which addressed the alleged discriminatory salary. Thus, the complaint clearly does not set forth a due process claim for errors in the administrative proceedings. Neither does the complaint mention any attempt by Gilbert to expand the scope of the administrative proceedings to include class allegations (as she now characterizes the basis of the due process claim). Gilbert has not, in any event, sought to pursue a class claim here.[10]

Plaintiff does not mention her due process claim in her opposition memorandum except to note that she initially pursued such a claim (though incorrectly characterized as discussed above). She does not, therefore, address the Secretary's argument that her due process claim, *as pled in the complaint*, is barred by sovereign immunity.

Finally, Gilmore challenges the timeliness of the Secretary's motion, suggesting that the deadline was "presumably . . . extended" by an extension of other deadlines, but only to May 15, 2008. The motion was filed on May 28, 2008.

## DISCUSSION

**I.     Timeliness of Motion**

Through her last argument, Gilbert asks the court not to consider the merits of the Secretary's motion. The court will, therefore, address Gilbert's last argument first.[11]

The original scheduling order established a January 14, 2008, deadline for discovery and a

---

[10] The due process claim as characterized in Plaintiff's responsive memorandum suggests a possible basis for allowing her to pursue broader claims in this action than were allowed to be pursued in the administrative proceedings. Such claims would, however, be pursued under Title VII, not under the due process clause. The effect of the now-alleged due process violation on those claims would be to allow Plaintiff to proceed with them despite a failure to exhaust administrative remedies as to those claims.

[11] Defendant did not file a reply. Thus, the court has no explanation from Defendant for the delay.

9

March 17, 2008, deadline for dispositive motions. On January 8, 2008, Plaintiff requested that the discovery deadline be extended by sixty days and that "all other deadlines be extended accordingly." Dkt. No. 27. This request was granted by docket text order which did not specify any new deadlines. The most logical interpretation of the order granting Gilbert's extension request is that, in extending all deadlines "accordingly" (relative to the sixty-day extension of discovery), the court intended to extend all deadlines by sixty days. Under this interpretation, the new dispositive motions deadline would be May 16, 2008. Defendant did not file his motion for summary judgment until May 28, 2008. The docket does not reflect that any extension of the motions deadline was requested or granted. Thus, the motion was apparently filed nearly two weeks after the presumed deadline.

The court is, however, reluctant to strictly enforce a "presumed" deadline which is not expressly set out in an order. This is particularly true where the motion was filed relatively close to the presumed deadline and where the motion raises serious issues regarding the merits of the action.

Judicial economy also favors consideration of dispositive motions on their merits as such consideration may save all involved from wasted time and expense in preparing for and conducting an unnecessary trial. For all of these reasons, the court concludes that it should consider the merits of the summary judgment motion. At the same time, the court admonishes counsel not to rely on a presumption that the court will be similarly lenient in the future.

**II.     Rials' and Gilmore's Relative Qualifications.**

In her first argument on the merits, Gilmore suggests that she should have been offered a higher salary than Rials because she was better qualified for the position. This argument focuses on the type of qualifications which Dr. Thorne and Mr. Burch considered in selecting Gilmore for

10

the position when it was first advertised: Gilmore's specialized experience in the mental health field. *See, e.g.,* Affidavit of Janne Rakes Middleton.

The difficulty with this argument is that it ignores the distinction between the decision to hire (made by one set of decision makers based on one set of criteria) and the salary-setting decision (made by a different set of decision makers based on a different set of criteria). While Gilbert's greater experience in mental health nursing was determinative in the decision to offer her the position when first advertised, it was not a factor considered by the Nursing Board in setting salaries. That body considered only the candidate's years of experience as a nurse practitioner. There is no evidence that the Nursing Board treated Gilbert and Rials differently from each other or from other Nurse Practitioner applicants in considering only this category of experience.

Further, while an error may have been made in calculating the length of Rials' experience as a nurse practitioner based on the information provided to the Nursing Board, there is no indication that this error was due to consideration of race. As noted above, two of the three members of each of the two Nursing Boards were unaware of the applicants' race. In addition, while the error in calculating Rials' nurse Practitioner experience may have given Rials more credit than she was due, it did not cause Gilbert to receive less credit than she was due. Thus, the error itself did not injure Gilbert.

Neither is there any evidence that any error in former-employer's reports of Gilbert's experience was the fault of the Nursing Board or any other Dorn or VA representative. As discussed above, Gilbert's application and resume did not provide specific dates during which she served as a nurse practitioner. Thus, there was insufficient information to alert Human Resources and the Nursing Board to any claimed "discrepancies."

11

Finally, even when all alleged errors are corrected, Rials had more nurse practitioner experience than Gilbert. It is, therefore, reasonable to assume that Rials would, even with all corrections made, have been placed at a higher step-in-grade than Gilbert, although the ultimate difference may have been greater than was warranted by their actual differences in experience.

**III.     Alleged Disparate Treatment of Gilmore in Salary Setting Process.**

Gilmore argues that Rials was treated differently in the process in two respects. First, she argues that Rials was "allowed to request a particular salary." Second, Gilbert argues that Rials was allowed to intervene in the process to gather and correct documentation from her former employers.

The only evidence as to the first argument is Rials' testimony that Dr. Thorne asked her what salary she was looking for. Rials Testimony, Dkt. No. 32-4 at 39. Rials also testified that Dr. Thorne explained that she had no salary setting authority or ability to influence the salary to be awarded. *Id.* There is no evidence that either statement was untrue or that Dr. Thorne in any way attempted to or was able to influence the salary offered to Rials. Thus, Dr. Thorne's mere inquiry as to the salary Rials was seeking does not suggest that Rials was treated more favorably than Gilmore.[12]

By contrast, Dr. Thorne and Mr. Burch did attempt to intervene on Gilbert's behalf to try to increase the salary offered. While they failed in changing the salary offered (which is consistent with what Rials was advised on a later date), they were able to enhance the offer by gaining approval to offer a signing bonus which placed the first year offer above the Nursing Board's approved salary.

---

[12] Dr. Thorne's motivation in asking Rials what salary she was seeking is, more likely, simply reflective of Dr. Thorne's prior experience in having offered the position to a highly qualified candidate (Gilmore) but having lost that candidate due to an inability to offer her the salary she was seeking.

12

Thus, to the extent there was any differential treatment by Dr. Thorne, it appears to have favored Gilbert rather than Rials.

The alleged disparate treatment in allowing Rials to intervene in the process, likewise, fails to support any claim of discrimination. What evidence is available indicates that Rials, on her own initiative, undertook to gather information from her former employers. There is no evidence that this was suggested or encouraged by anyone on behalf of the VA. Neither is there any evidence that Gilbert took similar initiative or was dissuaded from doing so. In short, while the process may have advanced somewhat differently for Gilbert and Rials, those differences are not due to any action by the VA but to differences in the approaches taken by the two candidates. Thus, the differences are not evidence of disparate treatment in the salary setting procedures.

**IV**.     **Dorn's "History" of Discrimination and Gilmore's Proffered Affidavits.**

Gilmore also relies on affidavits which she suggests support the conclusion that Dorn has a history of discriminating against African-American nurses. Testimony of this sort would normally be excluded under Rule 404(b) of the Federal Rules of Evidence which precludes reliance on "[e]vidence of other . . . wrongs, or acts . . . to prove the character of a [party] in order to show action in conformity therewith" unless one of the various exceptions to the general exclusionary rule applies. The listed exceptions include "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b).

For present purposes, the court will assume without deciding that evidence of similar salary differences under similar circumstances might fit one or more of these exceptions, such as proof of motive, intent or absence of mistake. However, even if the proffered affidavits satisfied these requirements, the court would need to insure that the probative value of the evidence of other bad

13

acts was not significantly outweighed by any resulting unfair prejudice or risk of confusion of the issues.

As explained below, the proffered affidavits are too general and address situations too dissimilar to Gilmore's to allow the court to find that the proffered testimony falls within an exception to Rule 404(b). The same considerations convince the court that this evidence should be excluded under Rule 403 even if falling within such an exception.

Gilmore proffers three affidavits in support of her claim that Dorn has a history of racial discrimination.[13] The first affidavit is from Janne Rakes Middleton who avers that she has "been denied promotions continuously" and "strongly feel[s] that [these denials are] a form of retaliation due to my affiliation with the union and filing several EEO complaints against the agency." She also complains of low morale at Dorn and asserts that "there has always been racial disparity in treatment of the employees." Middleton does not, however, indicate her own race or claim that her alleged denials of promotion were due to race (as opposed to her union affiliation and retaliation for prior unspecified EEO complaints). Neither does Middleton provide any evidence to support her generic claim of "racial disparity in treatment of [Dorn] employees." Thus, nothing in Middleton's affidavit supports any inference that Dorn has a history of racial discrimination, much less that this generic history in some way supports Gilmore's specific claim or falls within the exceptions to Rule 404(b)'s general exclusionary rule.

The second affidavit is from Tempie M. Evans who generally repeats and supports Gilmore's factual allegations regarding her greater qualifications for the position than Rials. Evans also

---

[13] As explained above, the affidavit from Temple M. Evans may be proffered primarily in support of Gilmore's claim that she was more qualified than Rials. However, because this affidavit also includes references to racial discrimination, the court will consider it in this section.

14

suggests that Gilmore has "applied for many nursing positions since 2003, but was not selected for any." The Evans affidavit does not expressly state that it is given on first-hand information and, with limited exceptions relating to Evans' service as preceptor for Rials, does not provide facts from which such a conclusion could be drawn.

In any event, the issue in the present case does not relate to Gilmore's non-selection for any position as it is undisputed that Gilmore was deemed the best candidate when she competed against Rials for the nurse practitioner position and was, in fact, offered the position. The only issue here relates to alleged salary discrimination. Nothing in Evans' affidavit addresses that issue.

The Evans affidavit does, however, include generic statements that, in thirty-three years of service at Dorn, Evans has "witnessed lots of racial discrimination cases." Evans also claims to have "been a target of racial injustice," but concedes being "restored, made whole and [having] records cleared." There is no indication of the specific alleged instances of discrimination that Evans has observed been subjected to. Neither is any evidence of the alleged discrimination offered. Thus, as with Middleton's affidavit, Evans' affidavit is insufficient to support any inference that Dorn has a history of racial discrimination, much less that this generic history in some way supports Gilmore's specific claim or falls within one of the exceptions to Rule 404(b)'s exclusionary rule.

With the exception of the ink signatures, the third affidavit is utterly illegible. At best, the court can make out that the affidavit consists of four pages which are so poorly (lightly) copied that one can only discern that the original was probably typed, the first page probably includes a caption (although it is illegible), and the last page bears signatures of a Jeanise Stanley as well as a notary. There is no legible content and, therefore, no basis for concluding that this affidavit would be any

15

more probative of a relevant pattern of discrimination than either of the other two affidavits.[14]

## V.     Due Process Claim

Gilbert offers no argument in opposition to the Secretary's legal argument that sovereign immunity bars her due process claim. The Secretary's argument appears well founded on its face when applied to the due process claim actually pled. *See Radin v. United States*, 699 F.2d 681, 684-85 (4th Cir. 1983) (holding sovereign immunity defense barred due process claim brought by discharged railroad employee against the United States and the National Mediation Board). Absent some contrary legal authority, the court is compelled to find Gilbert's due process claim barred.

## CONCLUSION

For the reasons set forth above, the court grants Defendant's motion for summary judgment in full. The Clerk of Court is directed to enter judgment in Defendant's favor.

IT IS SO ORDERED.

S/ Cameron McGowan Currie<br>
CAMERON MCGOWAN CURRIE<br>
UNITED STATES DISTRICT JUDGE

Columbia, South Carolina
November 5, 2008

---

[14] It is counsel's responsibility to insure that documents filed through the court's electronic filing system are legible after transmission.